# Supreme Court of the Navajo Nation

**In the Matter of: Certified Questions II**
**No. WR-CV-99-89**
**The Navajo Nation, et al., Plaintiffs,**
**v.**
**Peter MacDonald Sr., et al., Defendants.**
**Decided April 13, 1989**

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

Per curiam.

This is a decision on the final three questions certified to this Court by the Window Rock District Court. The questions are: (1) Is the Chairman empowered to terminate a probationary judge by action of the Chairman alone; (2) Is the probationary judge required to disqualify himself from a proceeding over which the judge is presiding and in which the Chairman is a party defendant when, subsequent to the commencement of the action and entry of a restraining order by the judge against the Chairman, the Chairman purports to remove the judge and declares his intention to refuse permanent appointment to the judge; and (3) Does the Navajo Tribal Council have the authority to relieve the Chairman of the Navajo Tribal Council and the Vice Chairman of the Navajo Tribal Council of their executive and legislative authority and place them on administrative leave with pay.

## I

On March 29, 1989, Judge Robert Yazzie of the Window Rock District Court certified four questions to this Court. On March 30, 1989, we accepted the four questions as proper questions for decision pursuant to *Navajo Housing Authority v. Betsoi*, 5 Nav. R. 5 (1984).

On March 31, 1989, we decided one of the four questions certified. *In re: Certified Questions I*, 6 Nav. R. 97 (1989). This Court may decide certified questions without benefit of briefs, but in this case we exercised our discretion and allowed briefs from the parties. As the temporary restraining order (TRO) entered by the Window Rock District Court was set to expire on April 6, 1989, we ordered that all briefs be filed by 5:00 P.M., April 3, 1989.

On April 3, 1989, five briefs were filed with this Court. On the same date, Mr.

Thomas Hynes filed a "Notice of Intent to Withdraw" as counsel for the defendants. Several defendants then filed requests for an extension of time to file briefs citing Mr. Hynes' withdrawal. This Court extended the time for filing of briefs for all parties to 5:00 P.M., April 10, 1989. Under the provisions of Rule 18 of the Navajo Rules of Civil Procedure, the TRO was extended for another fifteen days.

## II

Certified Question one is: Is the Chairman empowered to terminate a probationary judge by action of the Chairman alone? The answer is no. The Chairman of the Navajo Tribal Council is not empowered to act alone in either removing a probationary judge or denying a permanent appointment to a probationary judge.

The Navajo Tribal Code laws on the Judicial Branch provide for two ways by which a probationary judge can be terminated. The first is by removal and the second is by denial of permanent appointment. In either case the Chairman cannot act until after the Judiciary Committee of the Navajo Tribal Council has formally acted by recommendation.

## A

The law governing removal of a probationary judge is 7 N.T.C. § 355(d).[1]

> At any time during the probationary term of any Chief Justice, Justice or judge, regardless of the length of service of such judge, the Judiciary Committee may recommend to the Chairman of the Navajo Tribal Council that the probationary judge be removed from office. The Chairman of the Navajo Tribal Council, pursuant to such recommendation, may remove such probationary judge from office.

If a probationary judge is to be removed prior to the expiration of his probationary period, the Judiciary Committee must make a recommendation of removal to the Chairman. Pursuant to such recommendation, the Chairman *must* remove the probationary judge. No further removal proceeding is required. The removal is final.

The above statute reads that "[t]he Chairman of the Navajo Tribal Council, pursuant to such recommendation, may remove such probationary judge from office." The use of the word "may" appears to give the Chairman discretion to deny the Judiciary Committee's recommendation of removal; however, the actual word used in the statute is not necessarily controlling when determining whether a duty of a public official is discretionary or mandatory. If a statute directs the doing of something for the public good or for the benefit of a third person, even though worded as discretionary, it will be considered mandatory. *Supervisors of Rock Island County v. United States*, 71 U.S. 419 (1867); *Brooke v. Moore*, 60 Ariz. 551, 142 P.2d 211 (1943); *State ex rel. Robinson v. King*, 86

---

1. A construction of 7 N.T.C. § 352 is not necessary to a decision on the questions certified.

N.M. 231, 522 P.2d 83 (1974).

The above cited statute providing for removal of a probationary judge is not discretionary because the statute gives the public an overwhelming and compelling interest in ensuring that only qualified and ethics-conscious individuals become judges. The Navajo public has an interest in a strong and independent judiciary. Navajo sovereignty is strengthened by a strong and independent judiciary. For these reasons, a probationary judge who has been determined to be unfit for office by the Judiciary Committee must be removed by the Chairman. The public is protected by the removal of the judge.

B

The laws governing denial of permanent appointment to a probationary judge are 7 N.T.C. § 355(a), (c), and (d).

(a) The Chairman of the Tribal Council shall appoint the Chief Justice, Associate Justices, and District Court Judges with confirmation by the Navajo Tribal Council from among those recommended by the Judiciary Committee of the Navajo Tribal Council.

....

(c) A probationary Chief Justice, Justice or Judge shall not be recommended for permanent appointment unless he or she has successfully completed a course of training accredited for judges and he or she has a satisfactory performance evaluation as determined by the Chief Justice and the Judiciary Committee of the Tribal Council.

(d) .... At the conclusion of the two-year probationary term, the Judiciary Committee shall review the record and qualifications of each probationary judge and shall recommend to the Chairman whether or not each probationary judge has satisfactorily completed the probationary term and should be appointed to a permanent position. The Chairman shall not appoint to a permanent position any judge not recommended by the Judiciary Committee, but the Chairman, at his discretion, may appoint any judges recommended by the Judiciary Committee to permanent positions. The appointments shall be submitted to the Navajo Tribal Council for confirmation.

Upon initial appointment as a probationary judge, the judge serves a probationary term of two years. 7 N.T.C. § 355(b). During the probationary term, the judge must successfully complete a course of training accredited for judges and have a satisfactory performance evaluation by the Chief Justice and the Judiciary Committee. 7 N.T.C. § 355(c). At the conclusion of the probationary period, the judge is evaluated and recommended for or against permanent appointment.

The process for either appointment to permanent judge or denial of appointment to permanent judge begins with the Chief Justice. A recommendation either for appointment or denial of appointment to permanent judge is made by the Chief Justice pursuant to 7 N.T.C. § 371. The Chief Justice has first-hand knowl-

edge of the work of the probationary judge during the probationary term. The Chief Justice's recommendation will be based upon the training requirement and the performance evaluation required under 7 N.T.C. § 355 (c) .

The Chief Justice's recommendation for either permanent appointment or denial of permanent appointment proceeds to the Judiciary Committee. The Committee makes an independent determination of the training requirement and whether the probationary judge has performed satisfactorily over the two-year probationary term. 7 N.T.C. § 355(c), (d). The Judiciary Committee then makes either (1) a recommendation for appointment of the probationary judge as permanent judge or (2) a recommendation that the probationary judge be denied permanent appointment.

If the Judiciary Committee's recommendation is that the probationary judge be denied permanent appointment, the Chairman must deny the appointment. This directive flows from a provision in 7 N.T.C. § 355(d) which states that "[t]he chairman shall not appoint to a permanent position any judge not recommended by the Judiciary Committee." This provision mandates the Chairman to deny a permanent appointment to a judge recommended for denial by the Committee, because the law requires the Chairman to appoint judges to permanent positions "from among those recommended [for appointment] by the Judiciary Committee of the Navajo Tribal Council." 7 N.T.C. § 355(a).

The Chief Justice and the Judiciary Committee have seen the performance of a probationary judge during his probationary term. The Chairman has not. The Chief Justice and the Judiciary Committee have conducted periodic evaluations of the probationary judge while on probation. The Chairman has not. The Chief Justice and the Judiciary Committee are in prime positions to determine if a probationary judge is fit for continued service as a permanent judge. The Chairman is required to follow the Judiciary Committee's recommendation of denial.

Different events occur if the Judiciary Committee recommends a probationary judge to a permanent position. Upon receiving the recommendation for appointment, "the Chairman, at his discretion, may appoint [the] judge[] recommended by the Judiciary Committee to [a] permanent position[]. The appointment[] shall be submitted to the Navajo Tribal Council for confirmation." 7 N.T.C. § 355(d).

The words "at his discretion" seem to imply that the Chairman can overrule the Judiciary Committee's recommendation for permanent appointment at the outset. However, the legislative scheme for this particular statute and others in the Judicial Reform Act of 1985 does not allow for that interpretation.

History proves that the Navajo Tribal Council intended the Navajo court system to be strong and independent. For example, in 1958, the Council stated:

> (4) In order to give adequate authority to the judges, obtain the best qualified personnel for the courts and to remove the judges, insofar as possible, from the pressure of politics in making decisions and enforcing the law, it is essential that Navajo Tribal judges hereafter be appointed rather than elected.

*Navajo Tribal Council Resolution* CO-69-58 (October 16, 1958). In 1985, in the

Judicial Reform Act, the Council again stated:

(9) If the Navajo Nation is to continue as a sovereign Nation and to move forward toward the reality of a three branch form of government, the Supreme Judicial Council must cease to exist, as Tribal sovereignty requires strong and independent Tribal courts to enforce and apply the law.

....

(13) In furtherance of the goal of strengthening the Courts of the Navajo Nation, the Judicial Branch must have a court which will hear cases on appeal and render a final judgment based on law, equity, and tradition. The Supreme Court will be that court, a court which will have final appellate jurisdiction.

(14) Title 7 of the Navajo Tribal Code must be amended in order to carry out the intent of strengthening the Navajo Nation Courts by providing for the redesignation of the Navajo Tribal Court of Appeals as the Supreme Court of the Navajo Nation.

....

(17) In order to preserve an independent judiciary, it is necessary for the Judicial Branch to be able to hire, discipline and fire employees without resort to the Navajo Nation Personnel Policies and Procedures and Personnel Department.

*Navajo Tribal Council Resolution* CD-94-85 (December 4, 1985).

Other sections in Title Seven of the Navajo Tribal Code have the purpose of appointing only those people who meet the qualifications for judges, 7 N.T.C. § 354; providing that judges must serve a probationary term of two years, 7 N.T.C. § 355(b); and providing that probationary judges must complete a course of training and receive a satisfactory performance evaluation, 7 N.T.C. § 355(c). All these sections and others were intended to provide the Navajo Nation with a strong and independent judiciary.

The overall intent of the Navajo Tribal Council is to strengthen the Navajo courts and provide for independence of the Judicial Branch. Judges play a vital role in pursuit of this goal; therefore, the law provides that appointment of permanent judges is concluded by confirmation by the Navajo Tribal Council. 7 N.T.C. § 355(a), (d).

The legislative scheme does not allow the Chairman's denial of permanent appointment to a probationary judge to be final. The public has an overwhelming and compelling interest in ensuring that the best qualified people are appointed judges. The Chief Justice and the Judiciary Committee have knowledge of the performance of a probationary judge; therefore, if they recommend a probationary judge for permanent appointment, the Chairman must forward that appointment to the Navajo Tribal Council for its decision.

The Chairman's discretion is limited to making known his reasons why the Judiciary Committee's recommendation for appointment must not be granted. The Chairman must send the Committee's recommendation and his reservations

to the Council. The Navajo Tribal Council will make a final decision as to whether to grant permanent status to this type of probationary judge. This is how the laws governing appointment of permanent judges must be interpreted so that the checks and balances implicit in these laws will work.

This certified question concerns a letter dated March 16, 1989, wherein Chairman Peter MacDonald Sr. declined to appoint Judge Robert Yazzie as a permanent judge of the Navajo Nation. Judge Yazzie has been recommended for a permanent appointment as district judge of the Navajo Nation by the Chief Justice and the Judiciary Committee of the Navajo Tribal Council. Chairman MacDonald's denial of appointment of Judge Yazzie is not final under Navajo law. The final decision rests with the Navajo Tribal Council. In addition, there is still the question of whether Chairman MacDonald has legal authority to review the appointment of Judge Yazzie. For these reasons, Judge Robert Yazzie is still a valid judge of the Navajo Nation until denied appointment by the Navajo Tribal Council.

## III

Certified question two is: Is the probationary judge required to disqualify himself from a proceeding over which the judge is presiding and in which the Chairman is a party defendant when, subsequent to the commencement of the action and entry of a restraining order by the judge against the Chairman, the Chairman purports to remove the judge and declares his intention to refuse permanent appointment to the judge? The answer is no. Like certified question one, this question arises out of a particular set of facts.

## A

On January 10, 1989, the Chief Justice recommended probationary Judge Robert Yazzie for permanent appointment. On January 13, 1989, the Judiciary Committee recommended Judge Yazzie for permanent appointment. Both recommendations were conveyed to Chairman Peter MacDonald Sr. on January 20, 1989. On March 22, 1989, *Navajo Nation v. MacDonald*, No. WR-CV-99-89, was filed in the Window Rock District Court and a TRO (Temporary Restraining Order) was requested. Judge Yazzie granted the TRO. On March 23, 1989, Chairman MacDonald and the other defendants filed a petition for a writ of prohibition in this Court arguing that the Navajo Nation Sovereign Immunity Act barred the action and therefore the district court lacked jurisdiction. At the insistence of defendants' counsel, oral argument on the alternative writ was heard at 4:00 P.M. on March 23, 1989. At approximately 5:05 P.M., on March 23, 1989, a letter dated March 16, 1989, and signed by Chairman MacDonald was delivered to the Office of the Chief Justice. The letter stated that Chairman MacDonald was declining Judge Yazzie's permanent appointment and that from March 16, 1989, he was no longer a judge.

B

On February 6, 1978, the judges of the Navajo Nation agreed to abide by the Code of Judicial Conduct as promulgated by the American Bar Association. Canon 3C is that part of the Code setting standards for disqualification. It states:

3C: Disqualification.

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowedge of disputed evidentiary facts concerning the proceeding;

(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(c) he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

Although this is a certified question from the district court, where certification was consented to by counsel for the plaintiffs and counsel for Chairman MacDonald and the other defendants, the Court will examine the question from the perspective of the parties.

The answers to certified questions numbers one and three make it clear that the Chairman is only one step in the process of appointing or terminating a judge. The same is true for the Navajo Tribal Council. Thus, the interests of both parties are balanced. We will not hold that a probationary judge must disqualify himself in all matters in which any person or entity involved in his tenure as probationary judge and the permanent appointment process is a party. That will defeat the intent and legislative scheme of Title 7. The intent and legislative scheme of Title 7 is to guarantee an independent judiciary. We will not hold that intent and scheme ineffective.

If a moving party acts deliberately with an ulterior motive to provoke a judge to become biased or prejudiced against that party, the judge will not be disqualified. *Smith v. Smith*, 115 Ariz. 299, 564 P.2d 1266 (1977). "A party cannot engage in conduct which has the outward appearance of being improper, and then complain of the consequences when its conduct is taken at face value." *In re Union Leadership Corp.*, 292 F.2d 381, 391 (1st Cir. 1961).

The personal bias or prejudice concerning a party which is sufficient to disqualify a judge must arise from "an extra judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563 (1966). "A judge's reasonable belief that a party was acting with a purpose of disqualifying him, his conclusion that such action was contemptuous and reprehensible, and even a very considerable showing of irritation, is in no way equivalent to personal bias and prejudice." *In re Union Leadership Corp.*, 292 F.2d at 390.

Waiver of disqualification will be found where a party having knowledge of the facts upon which disqualification would be grounded asks the court to rule on material issues. *State v. Chavez*, 45 N.M. 161, 113 P.2d 179, 187 (1941). In this situation the existence of the March 16, 1989 letter was unknown to this Court, to Judge Robert Yazzie, and presumably to the plaintiffs at the time of the hearing on the TRO and the hearing on the request for an alternative writ. The only conclusion that the Court can reach is that defendants have waived disqualification on the grounds that the defendants failed to move for disqualification at the outset.

It is puzzling why defendants did not ask for a writ of prohibition to Judge Yazzie on the grounds that he had been terminated as a judge and therefore had no jurisdiction to act. Instead the defendants asserted only the bar of the Sovereign Immunity Act.

If any grounds for disqualification exists, they must be asserted to Judge Yazzie and ruled upon by him. In the answer to the first certified question, the Court has concluded that Judge Robert Yazzie has not been terminated as judge and that he does not lack jurisdiction to hear the case of *Navajo Nation v. MacDonald*, No. WR-CV-99-89. This does not foreclose any motions for disqualification which any party may properly make to the district court.

## IV

The final certified question is: Does the Navajo Tribal Council have the authority to relieve the Chairman of the Navajo Tribal Council and the Vice Chairman of the Navajo Tribal Council of their executive and legislative authority and place them on administrative leave with pay? The answer is yes, but after certain conditions are met. The Court will approach this question as proposed by defendants' counsel, Mr. Thomas Hynes:

> The defendants would ask this Court to forget about the political ramifications of its decision. Forget about what is in the best interests of Peter MacDonald and Johnny R. Thompson. Forget about what is in the best inter-

ests of Leonard Haskie and Irving Billie. Forget about what is in the best interests of various members of the Tribal Council. Forget about what is in the best interests of all the politicians who are jockeying for position on the Navajo Reservation, and rather *think about what is in the best interests of the Navajo People....* (emphasis added).

Defendants' Brief on Certified Question Four at 27 (Filed April 10, 1989).

A

What authority the Navajo Tribal Council has and what authority the Chairman and Vice Chairman have are best answered by reviewing the history of the Navajo Tribal Government, the creation of the offices of the Chairman and Vice Chairman, and the allocation of powers within the Navajo Government. The briefs for the parties argued those points.

We initially reject the defendants' argument that "[t]he relationship between the Chairman and Vice Chairman and the Tribal Council must be viewed in the light in which it existed in February of 1989." Defendants' Brief at 6. The Navajo Government has operated in varying forms over the centuries and the history of the Navajo people goes even further back in time. It would be a mistake to consider only a minute fraction of Navajo governmental existence.

The first attempt to form a centralized government for the Navajo people occurred at Fort Sumner, New Mexico. On May 29, 1868, ten Navajo men were selected by the Navajos then in captivity to serve as their delegates in consummating a treaty with the United States. One of the ten men, Barboncito, was selected by the delegates as their Chief. General William Sherman, on behalf of the United States, recognized Barboncito as the Chief of all the Navajos. Whatever power Barboncito had over the Navajo people at that time was apparently given by General Sherman. General Sherman said:

> We will now consider these ten men your principal men and we want them to select a chief, the remaining to compose his Council for we can not talk to all the Navajos. Barboncito was unanimously elected Chief - now from this time out you must do as Barboncito tells you, with him we will deal and do all for your good. When we leave here and go to your own country you must do as he tells you and when you get to your country you must obey him . . . .

*Record of the Navajo Treaty* - 1868 at 7 (K.C. Publications 1968) .

In 1923, the present Navajo Tribal Council was established by regulations promulgated by the Commissioner of Indian Affairs and approved by the Assistant Secretary for Indian Affairs. The Navajo Tribal Council was "created [as] a continuing body to be known as and recognized as the 'Navajo Tribal Council' with which administrative officers of the [United States] government may directly deal in all matters affecting the tribe." *Regulations Relating to the Navajo Tribe of Indians* § 3 (January 7, 1923) .

The original Tribal Council was selected to act on behalf of the Navajo people

in approving mineral leases on Navajo lands. R.W. Young, *A Political History of the Navajo Tribe* (1978); see also, Brief of Carol K. Retasket at 13; Brief of Amicus Curiae on Behalf of Plaintiffs at 4. The regulations further established the positions of Chairman and Vice Chairman of the Navajo Tribal Council. The Chairman was to be elected by the Council delegates by majority vote from outside the Council membership, and the Vice-Chairman was to be elected from the Council membership. *Regulations* at § 10.

In the summer of 1923, the newly created Tribal Council adopted the form of government proposed by the commissioner's regulations and thereby agreed to the creation of the offices of Chairman and Vice Chairman. The original Tribal Council elected its first Chairman, Chee Dodge, from outside its membership on July 7, 1923. The Vice Chairman was not elected until 1928. The first public election of the Chairman and Vice Chairman was not held until 1938. R.W. Young, *A Political History of the Navajo Tribe* (1978).

The original Navajo Tribal Council wasted no time in exercising authority as the governing body of the Navajo Nation. In 1923, the Council gave the Commissioner to the Navajo Tribe broad power of attorney to sign oil and gas leases on behalf of the Navajo Nation. The Council revoked this power in 1933. R.W. Young, *A Political History of the Navajo Tribe* (1978) .

In the ensuing years, the Council gave the office of Chairman authority to appoint executive committees to oversee routine tribal matters, to sign business documents on behalf of the Council, and to create plans of operations and approve modifications to tribal enterprises to facilitate tribal funds. Salaries were even approved for the Chairman and Vice Chairman. *Navajo Tribal Council Resolutions of April 10, 1937; July 19, 1937; October 14, 1949; and May 8, 1951.*

The Council's delegation of authority to the office of Chairman increased substantially since the 1930s. The Navajo Tribal Code is replete with laws proving that the source of power to be exercised by the Chairman and Vice Chairman is the Navajo Tribal Council, as the governing body of the Navajo Nation. Some examples are: (1) 2 N.T.C. § 343(c)(1), which allows the Chairman to chair the Advisory Committee; (2) 2 N.T.C. § 374(b)(5), which empowers the Chairman and the Budget and Finance Committee to review and approve contracts, subcontracts, and agreements which do not exceed $50,000.00; and (3) 2 N.T.C. § 1001, which outlines the powers and duties of the Chairman and Vice Chairman as follows:

> (a) The Chairman of the Navajo Tribal Council shall preside over the deliberations of the Council and shall also act with full authority as the chief executive officer of the Tribe's administrative organization in the conduct, supervision, and coordination of Tribal programs as approved by the Council. He shall have ultimate responsibility for the proper and efficient operation of all Tribal executive divisions and departments. He shall represent the Tribe in negotiations with governmental and private agencies and meet with many Off-Reservation organizations and groups in order to create favorable public opinion and good will toward the Navajo Tribe. The Chairman shall appoint various standing Committees, including the Advisory Committee, within the

Council, boards and commissions within and outside the Council, to help in determining Tribal policy and procedures and to suggest appropriate action on resolutions.

The Chairman's functions include but are not limited to those set out in this subsection.

(b) The Vice-Chairman of the Tribal Council, during the absence of the Chairman, shall preside over Tribal Council meetings and when so directed by the Chairman, perform designated duties of the chief executive officer. The Vice-Chairman may preside over meetings of the Advisory Committee and can sign documents on behalf of the Tribe when authorized by the Tribal Council.

Even the statutes say that the Chairman is "Chairman of the Navajo Tribal Council" and not of the Navajo Nation. 2 N.T.C. § 281(a). The same is true for the Vice Chairman of the Navajo Tribal Council. 2 N.T.C. § 282(a).

After reviewing the history of the relationship between the Council and the Chairman and Vice Chairman, we conclude that all authority of the offices of Chairman and Vice Chairman are derived from the Council. The powers are incumbent in the offices to be exercised by those people elected by the Navajo people to these two offices. The powers are there to be exercised in the best interests of the Navajo people.

There is nothing in either the history of the present Navajo Government or in the Tribal Code to support the argument that the source of the Chairman's and Vice Chairman's governmental authority is the voting public. In addition, there is nothing to support the argument that the offices of the Chairman and Vice Chairman are independent and separate from the Navajo Tribal Council. They all live in the same hogan and need each other to function.

The Navajo Nation Council clearly has authority to withdraw, limit, or supervise the exercise of power it gives to the offices of Chairman and Vice Chairman. The power to create an office and delegate authority to that office includes the power to abolish, withdraw, limit, or supervise exercise of those powers by the office holder. The Navajo Tribal Council can prevent a Chairman and Vice Chairman from exercising certain powers it has delegated to the offices of Chairman and Vice Chairman, and the Council can specify how those powers can be exercised. The latter has frequently been done by the Council as shown by the history of the Navajo Government.

## B

The question then arises whether the Navajo Tribal Council can place a Chairman or Vice Chairman on administrative leave with pay. The answer is yes, because the power to place those officials on leave is a part of the power the Council has to withdraw, limit, or supervise the exercise of powers it has bestowed on the offices of Chairman and Vice Chairman.

Arguments are made that a Chairman or Vice Chairman cannot be put on administrative leave with pay because there are no provisions in the Navajo Tribal Code for placing those public officials on leave. True, such provisions are

not in the Code, but to so hold ignores the fact that the offices of Chairman and Vice Chairman were created by the Council and whatever powers are in those offices were placed there by the Council. Without the Council giving and defining those powers the Chairman's or Vice Chairman's powers would not exist. If a Chairman or Vice Chairman is not exercising powers as defined by the Council, or if the powers are not exercised in the best interests of the Navajo people, or if the powers are being used to provide for personal gain or profit, then surely the Council can restrict use of those powers.

Arguments are also made that placing a Chairman or Vice Chairman on administrative leave with pay is the same as removal of these officials from office. We disagree.

The Navajo Personnel Policies and Procedures, appended as Memorandum No. 1 to Title Two of the Navajo Tribal Code, is instructive on administrative leave. Section 14, labeled administrative detail, states:

> In unusual circumstances, involving expediency or necessity, it may be necessary for an employee to absent himself from his regular duties and enter upon a period of administrative detail for such purposes and duties as may be determined to be in the best interest of the Tribe.... After completing this special administrative detail to the fullest satisfaction of the Tribe, the employee shall be entitled to return to his same job with commensurate fringe benefits.

The test for whether the official is on administrative leave is as follows. Within the Navajo Nation, administrative leave is invoked in unusual circumstances, involving expediency or necessity, for such purposes as may be determined to be in the best interests of the Navajo Nation. The leave must be for a specified period of time, and during this time the employee is to absent himself from his regular duties. Administrative leave does not remove a person from his position. The person is entitled to return to his same job with commensurate fringe benefits after the Tribe is fully satisfied that the person may resume his duties.

In contrast to administrative leave, removal is the *dismissal* of an official from office. Black's Law Dictionary 1164 (5th ed.1979). The official, removed, has no further ties to the office from which he was removed, no right to exercise powers of the office, no position or title, and no attendant pecuniary benefits. The removed official is not entitled to return to his same job and he cannot assume and exercise the powers of the office.

Although the Chairman and Vice Chairman receive pecuniary and other fringe benefits from their positions, this Court is not holding that the Navajo Personnel Policies and Procedures apply to these officials. Section 14 of the Personnel Policies is used only to establish the test to be used by the district court in determining whether an official is on administrative leave or is in fact removed.

## C

Certain grounds must exist before the Navajo Tribal Council can consider placing a Chairman or Vice Chairman on administrative leave. No Chairman or

Vice Chairman should be placed on leave simply because a majority of the Tribal Council disagree with his policies or because of a personality conflict between these officials.

Public officials serving in the Navajo Government, no matter what position they hold, are trustees of the Navajo people. The government officials occupy a fiduciary relationship to the Navajo people. The Navajo people have placed a high degree of trust in these officials; therefore, Navajo government officials owe an undivided duty to the Navajo people, and to serve the best interests of the Navajo people.

All Navajo government officials are obligated to exercise the powers of their offices honestly, faithfully, legally, ethically, and to the best of their abilities, in a way which is beyond suspicion of irregularities. In short, these officials are obligated to perform primarily in the best interests of the Navajo people. The Navajo people do not expect their officials to exercise powers corruptly or use powers for personal gain or profit. In fact, 2 N.T.C. § 1001 places a duty on the Chairman to "represent the Tribe in negotiations with governmental and private agencies and meet with many off-reservation organizations and groups *in order to create favorable Public opinion and good will toward the Navajo Tribe.*" (emphasis added).

The Navajo traditional concept of fiduciary trust of a leader (*naat'aani*) is just as relevant here. After the epic battles were fought by the Hero Twins, the Navajo people set on the path of becoming a strong nation. It became necessary to select *naat'aaniis* by a consensus of the people. A *naat'aanii* was not a powerful politician nor was he a mighty chief. A *naat'aanii* was chosen based upon his ability to help the people survive and whatever authority he had was based upon that ability and the trust placed in him by the people. If a *naat'aanii* lost the trust of his people, the people simply ceased to follow him or even listen to his words. The *naat'aanii* indeed was expected to be honest, faithful and truthful in dealing with his people.

The Navajo Tribal Council can place a Chairman or Vice Chairman on administrative leave with pay if it has reasonable grounds to believe that the official seriously breached his fiduciary trust to the Navajo people and if the leave will be in the best interests of the Navajo Nation. Leave which is in the best interests of the tribe will serve to protect the tribe against conduct which threatens or has some direct effect on the property and resources of the tribe, or the political integrity, economic security or health, safety, and welfare of the tribe.

Serious allegations pointing to breach of fiduciary duties by the Chairman or Vice Chairman solicited under oath by a properly authorized investigatory body qualify as grounds for placing the official on administrative leave with pay. These allegations of misconduct may involve fraud, bribery, receipt of kickbacks, or of the official's involvement in a conspiracy to cover up misconduct, or to personally profit from transactions involving Navajo public property. A Chairman or Vice Chairman may be put on administrative leave if serious allegations of criminal activity are lodged against him which if brought in a state or

federal tribunal would be charged as a felony.

Serious allegations of any of the factors given in 11 N.T.C. § 211, combined with some evidence of those allegations, are also grounds for placing a Chairman or Vice Chairman on administrative leave. Administrative leave may be an option prior to initiating proceedings for removal under this section. Serious allegations combined with some evidence that a Chairman or Vice Chairman may have violated a tribal law, which if proven true would subject the official to removal, are also grounds.

If a felony charge is actually brought against a Chairman or Vice Chairman in a federal or state court, or if either a criminal charge or civil suit stemming from violation of the public trust is brought against these officials in Navajo court, then those grounds may be used to place the official on administrative leave.

## D

The final question posed is what are the due process requirements, if any, attendant to the process of putting a Chairman or Vice Chairman on administrative leave. The Navajo Nation Bill of Rights, 1 N.T.C. § 3 (1986), states:

> Life, liberty and the pursuit of happiness are recognized as fundamental individual rights of all human beings. Equality of rights under the law shall not be denied or abridged by the Navajo Nation on account of sex nor shall any person within its jurisdiction be denied equal protection in accordance with the laws of the Navajo Nation, nor be deprived of life, liberty or property, without due process of law. Nor shall such rights be deprived by any bill of attainder or ex post facto law.

Navajo law governs the interpretation of due process under the Navajo Bill of Rights and the Indian Civil Rights Act, 25 U.S.C. § 1302(8) (1968). *Billie v. Abbott*, 6 Nav. R. 66 (1988). Due process under the Navajo Bill of Rights and the Indian Civil Rights Act

> must be interpreted in a way that will enhance Navajo culture and tradition.... To enhance the Navajo culture, the Navajo courts must synthesize the principles of Navajo government and custom law. From this synthesis Navajo due process is formed.
>
> When Navajo sovereignty and cultural autonomy are at stake, the Navajo courts must have broad-based discretion in interpreting the due process clauses of the ICRA and NBR, and the courts may apply Navajo due process in a way that protects civil liberties while preserving Navajo culture and self-government.

*Billie v. Abbott*, 6 Nav. R. at 74.

The right to a due process hearing is required only upon a showing of governmental action which adversely affects a person's life, liberty or property interest. *Yazzie v. Jumbo*, 5 Nav. R. 75, 76 (1986). Procedural due process requires notice, an opportunity to be heard and to defend before a tribunal with jurisdiction to

hear the matter. *Id.* at 76.

Any due process requirements attendant to placing a Chairman or Vice Chairman on administrative leave will depend upon a finding that the official's life, liberty or property interest has been adversely affected by Navajo governmental action. In a prior case involving an elected official we said, "An elected official does not have a property right in public office." *In re Removal of Katenay*, 6 Nav. R. 81, 85 (1989).

However as in *Katenay*, a statutory scheme can be the source of due process rights for an elected official. *Id.* at 85. There are a number of basic protections that the Navajo Tribal Council should afford while placing a Chairman or Vice Chairman on administrative leave. These are: (1) the Navajo Tribal Council must act in a properly convened session with a quorum as established in the Navajo Tribal Code; (2) an agenda must be properly adopted by the Council, although procedures for presentation of resolutions and for voting on resolutions are within the power of the Tribal Council; (3) the resolution placing a Chairman or Vice Chairman on administrative leave must pass by a majority vote of the Navajo Tribal Council present, see 2 N.T.C. § 172(b); and (4) the resolution placing a Chairman or Vice Chairman on administrative leave must not be a bill of attainder.

A bill of attainder is apparently unknown to traditional Navajo culture. The parties did not argue anything from Navajo culture or tradition which would mirror the elements of a bill attainder as commonly defined by American law.

We adopt the common definition of bill of attainder; therefore, under the Indian Civil Rights Act and Navajo Bill of Rights, a bill of attainder is a law that legislatively determines guilt and inflicts punishment upon an identifiable person or group without the protections of trial in the Navajo courts. This definition has two elements: first, an element of punishment must be inflicted by some tribal authority other than tribal judicial authority; and second, an element of specificity, that is, a singling out of an individual or identifiable group for infliction of punishment.

*Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), recognizes three tests for determining whether punishment is present. These tests are adopted by this Court. The first test is the historical experience test. This test determines punishment in terms of what historically has been regarded as punishment for purposes of bills of attainder and bills of pains under the law of England and the United States. The historical test may include what historically has been regarded as punishment under Navajo common law. See *In re Estate of Belone*, 5 Nav. R. 161 (1987), for discussion of Navajo common law. The second test is the functional test. This test considers the extent to which a law challenged as a bill of attainder furthers any nonpunitive purposes underlying the law. The third test is the motivational test. The inquiry here is whether the legislative record evinces a legislative intent to punish.

The district court will determine whether a resolution passed by the Navajo Tribal Council placing a Chairman or Vice Chairman on administrative leave with pay is a prohibited bill of attainder. The district court will use the elements set forth above to make that determination.